**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GIANCARLO INCALZA,
        *Plaintiff-Appellee,*

v.

FENDI NORTH AMERICA, INC.,
        *Defendant-Appellant.*

No. 04-57119

D.C. No.
CV-03-06720-
MMM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
December 7, 2006—Pasadena, California

Filed March 6, 2007

Before: Stephen Reinhardt, Melvin Brunetti, and
Alex Kozinski, Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

Gene C. Schaerr, Winston & Strawn LLP, Washington, D.C. and Laura R. Petroff and Jennifer Rappoport, Winston & Strawn LLP, Los Angeles, California, for the appellant.

Carney R. Shegerian and Donald Conway, Shegerian & Associates, Inc., Beverly Hills, California, for the appellee.

**OPINION**

REINHARDT, Circuit Judge:

We consider whether, in this case, the Immigration Reform and Control Act of 1986 (IRCA) preempts California labor laws that forbid employers from firing an employee without good cause. We also consider whether the district court abused its discretion in denying defendant's motion for a new trial. In both instances, our answer is No.

## I. FACTUAL AND PROCEDURAL HISTORY

In June of 1990, Giancarlo Incalza, a native and citizen of Italy with two years of business education, began working as

a sales associate for Fendi in Rome. Approximately six months after his employment started, Fendi offered him a sales position in its New York City store. Paola Fendi, the head of the company, assured him that his employment would be secure as long as he continued to perform well. Incalza accepted the offer and moved to the United States on an E-1 visa secured with Fendi's assistance.

Incalza worked at Fendi's New York store from 1990 until 2000. During this period, the company renewed his visa several times. Management also made further assurances to him regarding his job security.

In August, 2000, Incalza was promoted to manager of Fendi's Beverly Hills store. During his tenure in Beverly Hills, he consistently received positive performance reviews. There was considerable evidence, however, that his supervisor, Robert King, did not like him and would have liked to replace him.

In mid-2002, French nationals purchased a majority interest in Fendi. In January, 2003, Fendi's immigration counsel, Andrew Lerner, advised his client that, because the company was now French-owned, the E-1 visas issued to Italian nationals were no longer valid. Lerner explained that this affected two employees: Incalza and Mauricio Graziani. He also informed Fendi that H1-B visas were probably available to both Graziani and Incalza. He told the company that Graziani and Incalza were essentially in the same situation, although he thought that Graziani might have a slightly easier time obtaining an H1-B visa because he had some post-secondary education and had previously received an H1-B visa. Lerner was unaware at the time that Incalza also had two years of post-secondary education. In any event, he explained that, for a fee, the company could get a determination within fifteen days regarding whether the two employees would be able to qualify for H1-B visas. Lerner did not provide any advice

regarding whether or not to terminate either Incalza or Graziani.

Although Lerner offered to investigate further, Fendi did not accept his offer. Instead, it requested that he file an H1-B petition on behalf of Graziani, but not Incalza. Graziani was granted an H1-B visa, and remained on Fendi's payroll without interruption.

King, in the presence of the human resources director, fired Incalza on January 20, 2003, telling him, falsely, that nothing could be done to remedy his visa problems. Incalza then requested that he be allowed to take an unpaid leave of absence. He explained that he was planning to marry his fiancée, an American citizen, the following month and would be eligible for a green card. King, however, repeated that the immigration problem could not be resolved, and that a leave of absence was not an option.

Incalza then wrote Fendi a letter on February 28, 2003, asking that it give him back his former job once his visa issue was resolved. In a follow-up phone conversation, the human resources director told Incalza that Fendi would not re-hire him. Incalza then married his fiancée on March 27, 2003 and received work authorization as the spouse of an American citizen in April. At the time of his marriage, Fendi still had not filled his position. In early April, Fendi hired Grace Varella, a non-Italian, as manager of the Beverly Hills store.

Incalza filed an action in California Superior Court claiming that he was wrongfully terminated 1) in violation of an implied contract that he would be fired only for good cause, and 2) because of his Italian heritage, in violation of the Fair Employment and Housing Act, CAL. GOV'T CODE §§ 12900-12960.[1] Fendi removed the case to federal court on the basis

---

[1]Incalza also raised a number of other claims, but all were dismissed or voluntarily withdrawn prior to trial and are not at issue in this action.

of diversity jurisdiction, and filed a motion for summary judgment. It argued that Incalza's claims lacked merit because it was compelled by IRCA to terminate him when it discovered that his E-1 visa was no longer valid. It further argued that California law, to the extent it required a different result, was preempted. The district court denied the motion.

At the trial, Incalza introduced evidence that 1) Fendi's policy is not to terminate employees without good cause, 2) the custom of the fashion industry is not to terminate employees without good cause, 3) Incalza was employed at Fendi for thirteen years, and 4) Fendi management gave Incalza oral assurances of continued employment.

A four-day jury trial followed. The jury found for Incalza on the implied contract claim, but for Fendi on the discrimination claim. It awarded Incalza $1,088,440. The jury was instructed that Fendi could discharge an employee in good faith and for a fair reason, but that it should find for Incalza if it found that the stated reason was simply a pretext. Fendi moved for a new trial, and the district court denied the motion. Fendi appealed.

## II.   DISCUSSION

### A.   Conflict Preemption

[1] California law provides remedies to workers who are terminated in violation of an express or implied agreement that they will not be discharged without good cause. *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1100-01 (Cal. 2000). The California legislature has made clear that this rule applies to illegal immigrants as well as other employees. Under California law, "[a]ll protections, rights, and remedies available under state law, except any reinstatement remedy prohibited by federal law, are available to all individuals regardless of immigration status who have applied for employment, or who are or who have been employed, in this state." CAL. CIV. CODE

§ 3339(a); CAL. LAB. CODE § 1171.5(a); CAL. GOV'T CODE
§ 7285(a). Additionally, California law provides that "[f]or
purposes of enforcing state labor, employment, civil rights,
and employee housing laws, a person's immigration status is
irrelevant to the issue of liability, and in proceedings or dis-
covery undertaken to enforce those state laws no inquiry shall
be permitted into a person's immigration status except where
the person seeking to make this inquiry has shown by clear
and convincing evidence that this inquiry is necessary in order
to comply with federal immigration law." CAL. CIV. CODE
§ 3339(b); CAL. LAB. CODE § 1171.5(b); CAL. GOV'T CODE
§ 7285(b).

   **[2]** Federal law, however, forbids employers from know-
ingly employing unauthorized aliens. Specifically, under
IRCA, it is "unlawful for a person or other entity, after hiring
an alien for employment in accordance with [the Act], to con-
tinue to employ the alien in the United States knowing the
alien is (or has become) an unauthorized alien with respect to
such employment." 8 U.S.C. § 1324a(a)(2).

   **[3]** Conflict preemption[2] occurs when either 1) it is not
"possible to comply with the state law without triggering fed-
eral enforcement action," *Jones v. Rath Packing Co.*, 430 U.S.
519, 540 (1977), or 2) state law "stands as an obstacle to the
accomplishment and execution of the full purposes and objec-
tives of Congress," *Volt Info. Science, Inc. v. Bd. of Trs. of the
Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989)
(quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Ten-

---

   [2]"Preemption can occur in one of three ways: express preemption by
statute, occupation of the field, or conflict between state and federal regu-
lation." *U.S. v. 4,432 Mastercases of Cigarettes, More Or Less*, 448 F.3d
1168, 1189 (9th Cir. 2006) (quoting *Air Conditioning & Refrigeration
Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 495 (9th
Cir. 2005), *cert. denied*, 126 S. Ct. 2887 (2006)). Neither party suggests
that IRCA expressly preempts state labor laws protecting undocumented
employees. Nor do the parties argue that field preemption applies. Thus,
conflict preemption is the only type of preemption at issue in this case.

sion between federal and state law is not enough to establish conflict preemption. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984). We find preemption only in "those situations where conflicts will necessarily arise." *Goldstein v. California*, 412 U.S. 546, 554 (1973). A "hypothetical conflict is not a sufficient basis for preemption." *Total TV v. Palmer Communications, Inc.*, 69 F.3d 298, 304 (9th Cir. 1995).

The parties agree that there is no conflict between California law and IRCA as applied to an employer who is required to terminate an employee by IRCA and does so in order to comply with that statute. Under such circumstances, the employer can obey both laws because compliance with IRCA provides good cause, as defined by California law, for terminating unauthorized aliens. The point of contention that primarily divides the parties is whether federal and state law conflict when an employer who is required by federal law to terminate an unlawful alien does so, not because of IRCA, but for reasons that are unlawful under state law, and is required to pay damages for the violation of state law. The district court agreed with Incalza and held that state and federal law do not conflict under such circumstances because California law requires only that the employer pay damages for the violation of state law, not that it employ an alien in violation of federal law. Thus, the district court ruled, the employer can obey both laws by terminating the employee, as required by federal law, and, where the motive for the termination is contrary to state law, paying damages, as required by such law.

**[4]** We need not reach the question decided by the district court, however. There is no conflict in the case before us for a narrower reason. Here, not only was Incalza not discharged because of his unauthorized employment status, but Fendi could lawfully have taken action other than discharge, and been in compliance with IRCA. That Fendi itself recognized that discharge was not required is evidenced by its decision to

continue to employ Graziani while obtaining an H1-B visa for him.

[5] It was possible for Fendi to obey federal law in this case without creating a conflict with state law because there were remedies short of discharge that were permissible under federal law. Fendi could have granted Incalza's request for temporary, unpaid leave so that he could resolve his work authorization problems.[3] IRCA requires that an employer not "continue to employ" workers if it discovers that they are unauthorized, but does not bar an employer from suspending an employee or placing him on unpaid leave for a reasonable period while he remedies the deficiency in his status. We read the IRCA implementing regulations as deeming an individual "employed" only if he is performing work and receiving remuneration for that work. The regulations define employment as "any service or labor performed by an employee for an employer within the United States."[4] 8 C.F.R. § 274a.1(h). An employee is defined as "an individual who provides services or labor for an employer for wages or other remuneration." 8 C.F.R. § 274a.1(f). Thus, an entity does not "continue to employ" an alien in violation of 8 U.S.C. § 1324a(a)(2)

---

[3]Fendi suggests that a loss of work authorization by Incalza could not be considered temporary because "[a]s a factual matter, Incalza's 'temporary' lack of work authorization lasted five months beyond the date he was terminated, and was [remedied] based on his marriage." This argument is disingenuous. Had Fendi applied for an H1-B visa on Incalza's behalf, his visa problem might well have been largely resolved within 15 days. Even without Fendi's assistance, Incalza would have obtained a work permit earlier had he not been terminated. Incalza was compelled to delay his wedding as a result of his termination. Thus, Fendi's actions were responsible for the duration of the break in Incalza's work authorization. Had Fendi taken immediate action, it is possible that it could have obtained work authorization for Incalza so quickly that it would not even have been required to put him on leave. *See New El Rey Sausage Co. v. INS*, 925 F.2d 1153, 1156-57 (9th Cir. 1991). This is precisely what happened with Graziani, for whom Fendi obtained an H1-B visa.

[4]The regulation also includes some exceptions, which are not relevant here.

unless that individual is continuing to perform a service or labor for the employer for which it is providing remuneration. The employment status of an employee placed on leave without pay is, in effect, suspended during the period that he is neither working nor receiving pay.[5] 8 U.S.C. § 1342a(a)(2).

**[6]** Placing employees on unpaid leave for a reasonable period is consistent with the purpose of IRCA, as reflected in the implementing regulations. *Cf. Volt Info. Science, Inc.*, 489 U.S. at 477. In passing IRCA, Congress wished to stop payments of wages to unauthorized workers, which act as a "magnet . . . attract[ing] aliens here illegally," and to prevent those workers from taking jobs that would otherwise go to citizens. P.L. 99-603, IMMIGRATION REFORM AND CONTROL ACT OF 1986 H.R. REP. 99-682(I), at 46, *as reprinted in* 1986 U.S.C.C.A.N. at 5650. If an alien is not working and is not being paid, IRCA's purposes are not contravened.

Moreover, allowing employers to place employees on unpaid leave furthers Congress's secondary purpose of protecting the rights of lawful alien workers. It affords employers a means of preserving the seniority and other benefits of lawful workers whose work authorization has been questioned or who lack adequate documentation. Concern with protecting such workers from discrimination based on national origin engendered by IRCA's employer sanctions was repeatedly expressed by members of Congress.[6] *See, e.g.*, 132 CONG.

[5]Fendi relies on the definition of the term "employ" in the implementing regulations of the Family Medical Leave Act (FMLA) to argue that employees on leave remain employed. That definition is irrelevant, however, because the definition of "employ" can vary from statute to statute. *See Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 1349-50 (1992) (differentiating between the definition of "employ" under ERISA and under the Fair Labor Standards Act). The "textual asymmetry between the two statutes precludes reliance" on FMLA to interpret the term in IRCA. *Id.* at 1350.

[6]So great was Congress's concern that it wrote protections against discrimination for lawful aliens into IRCA and created an Office of Special

Rec. 31640 (1986) (statement of Rep. Bryant) ("Many Americans are concerned that employer sanctions will lead to increased discrimination against Hispanics and other Americans who are legally here and entitled to work. I am very sensitive to that concern. And I have worked hard to put the maximum protections against discrimination into the bill."). Allowing employers to place employees on leave without pay while problems or concerns with their immigration status are resolved protects lawful employees from discharges by employers who, concerned with liability under IRCA, would otherwise terminate those employees first and ask questions later. *See New El Rey Sausage Co. v. INS*, 925 F.2d 1153, 1157 (9th Cir. 1991) (noting that a requirement that employers immediately terminate employees without allowing the employees time to gather documents to prove their immigration status might raise constitutional concerns). Unpaid leave also permits individuals to obtain a different form of work permit to meet changed conditions or renew a permit that has expired as a result of the employer or employee's inadvertent failure to file for renewal in sufficient time or as the result of the agency's failure to act promptly upon an application due to the overwhelming backlog it frequently confronts.

Fendi also argues that *Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137 (2002), requires that it terminate Incalza immediately, regardless of the circumstances. *Hoffman* describes IRCA as requiring that "if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status." *Id.* at 148. Fendi argues that the Court in *Hoff-*

---

Counsel in the Justice Department "for the purpose of investigat[ing] and prosecuting any charges of discrimination due to an unlawful immigration-related employment practice." 132 Cong. Rec. 31632 (1986); *see also* 8 U.S.C. § 1324b (detailing the duties of the "Special Counsel for Immigration-Related Unfair Employment Practices").

*man* held that the phrase "continue to employ" in 8 U.S.C. § 1324a means "compelled to discharge immediately." *Hoffman*, however, did not address the question of terminating employees whose work authorization problems could be expeditiously resolved by renewing an expired application or changing the form of an existing permit. To the contrary, it dealt with undocumented aliens working in a factory without any basis for, or prospect of, obtaining legal status. Unpaid leave would have accomplished absolutely no purpose in their cases. We read *Hoffman* as instructing that, as a general rule, individuals who are indisputably not authorized to work must be discharged immediately. An individual who has an opportunity to switch from an E-1 visa to an H1-B visa, or some other form of work authorization, is, however, another matter, as is an individual whose status is either unclear or disputed. *Hoffman* did not consider the question whether employees who are able to resolve their work authorization problems within a short time may be suspended or granted leave without pay for the interim period. We conclude, for the reasons stated above, that such a practice is fully consistent with IRCA. *See also Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1114-15 (10th Cir. 2006) (finding that an employer who placed an employee on leave without pay while his immigration status was being clarified could defend itself in a subsequent Title VII suit on the basis that it did so to comply with IRCA).

Finally, Fendi argues that, under *Hoffman*, IRCA preempts California law to the extent that the state law authorizes the payment of damages to aliens who are not authorized to work in this country. We need not decide here what damages would be available to a worker who is not authorized to work. Incalza, except for a short period principally resulting from his employer's actions, has been authorized to work at all times. He is currently working in the United States lawfully, although he is earning much less money than he did at Fendi. Under these circumstances, damages, even damages for lost

wages, do not create a conflict between immigration law and California law.[7]

**[7]** In sum, we hold that Fendi was not required by IRCA to terminate Incalza because it could have suspended him or placed him on leave without pay for a reasonable period while he was obtaining a change in work authorization to which he was entitled. Thus, in this case, California law does not conflict with federal law; it was possible to comply with and satisfy the purposes of both. Accordingly, we affirm the district court's conclusion that California labor laws, as applied to Incalza, are not preempted by IRCA.

### B.   *Sufficiency of the Evidence*

Fendi argues that the jury's decision that it lacked good cause to discharge Incalza is not supported by the evidence. In Fendi's view, Incalza must both show cause to think Fendi's explanation for terminating him was false and prove that it fired him for some other particular reason. Fendi further argues that, because the jury found for it on the discrimination claim, Incalza did not prove that it had a particular unlawful reason, and, thus, did not demonstrate pretext.

**[8]** Under California law, an employer has good cause to terminate an employee if it has "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual." *Cotran v. Rollins Hudig Hall Int'l*, 948 P.2d 412, 422 (Cal. 1998). The district court concluded that there was sufficient evidence from which the jury could have decided that Incalza was fired because of King's personal ani-

---

[7]To the extent that a small part of the damages awarded by the jury may cover a period for which Incalza might have been placed on leave without pay, and for which recovery may be questionable, no separate issue is raised by Fendi, and, thus, we need not review the record to determine that specific amount.

mosity towards him or because King otherwise generally wished to replace him as manager of the Beverly Hills store.

A district court's decision to deny a motion for a new trial is reviewed for abuse of discretion. *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989). Such motion may be granted on insufficiency of evidence grounds "only if the verdict is against the 'great weight' of the evidence, or 'it is quite clear that the jury has reached a seriously erroneous result.' " *Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987) (quoting *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1347 (9th Cir. 1984)).

[9] The district court summarized the evidence demonstrating that Incalza's manager, King, wanted to get rid of Incalza. Specifically, King had recommended against promoting Incalza to manage the Beverly Hills store in the first place. King also testified that he had concerns regarding Incalza's "negativity" and regarding the impact of Incalza's attitude on the store and the staff. Additionally, King testified that Incalza did not show initiative. King's testimony was directly contradicted by the testimony of Incalza's prior manager and by Incalza's consistently high performance reviews. King also insisted that Incalza's visa problems could not be remedied, even after Incalza reminded him that he would soon be eligible for a green card due to his upcoming marriage, and even though Fendi did, without difficulty, resolve the status of a similarly situated employee, Graziani. As such, the district court held that the "jury could have concluded that King did not favor installing Incalza as Beverly Hills store manager in the first place, and that he was looking for an excuse to remove him from the position." In light of the evidence in the record regarding King's dislike of Incalza and Fendi's disparate treatment of Graziani, we hold that the district court did not abuse its discretion in denying Fendi's motion for a new trial.

### *III.   CONCLUSION*

We hold that California law, as applied in this case, is not preempted by IRCA. We also hold that the district court did not abuse its discretion in finding that the jury's verdict was supported by sufficient evidence because Incalza met his burden of proving pretext.

AFFIRMED.