**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARAMARK FACILITY SERVICES,
           *Plaintiff-counter-*
           *defendant-Appellee,*

        v.

SERVICE EMPLOYEES INTERNATIONAL
UNION, LOCAL 1877, AFL CIO
CLC,

           *Defendant-counter-*
           *claimant-Appellant.*

No. 06-56662

D.C. No.
CV-06-00608-GPS

OPINION

Appeal from the United States District Court
for the Central District of California
George P. Schiavelli, District Judge, Presiding

Argued and Submitted
April 10, 2008—Pasadena, California

Filed June 16, 2008

Before: Cynthia Holcomb Hall, Thomas G. Nelson, and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Hall

6913

**COUNSEL**

Steven R. Wall and Robert Jon Hendricks, Morgan, Lewis & Brockius, Philadelphia, Pennsylvania, and Los Angeles, California, for the defendant-counter-claimant-appellant.

Manjari Chawla and David A. Rosenfeld, Weinberg, Roger & Rosenfeld, Alameda, California, for the plaintiff-counter-defendant-appellee.

Monica Guizar, National Immigration Law Center, Los Angeles, California, for the amicus curiae.

**OPINION**

HALL, Circuit Judge:

## I. INTRODUCTION

This case arose from the response by Aramark Facility Services ("Aramark") to a "no-match letter" from the Social Security Administration ("SSA"), which indicated that Ara-

mark had reported information for 48 of its employees at the Staples Center in downtown Los Angeles that did not match the SSA's database. Suspecting immigration violations, Aramark told the listed employees they had three days to correct the mismatches by proving they had begun the process of applying for a new social security card. Seven to ten days later, Aramark fired the 33 employees who did not timely comply.

Local 1877 of the Service Employees International Union ("SEIU") filed a grievance on behalf of the fired workers, contending the terminations were without just cause and thus in breach of the collective bargaining agreement ("CBA") between Aramark and SEIU. An arbitrator ruled for SEIU and awarded the fired workers back-pay and reinstatement, finding there was no convincing information that any of the fired workers were undocumented. The district court vacated the award on the ground that it violated public policy. SEIU timely appealed.

This case boils down to a single issue: whether the SSA's no-match letter — and the fired employees' responses — put Aramark on constructive notice that it was employing undocumented workers. If so, the arbitrator's award would force Aramark to violate federal immigration law, and therefore was properly vacated as against public policy. If not, the award must stand.

As we explain below, Aramark has not established constructive knowledge of any immigration violations. Constructive knowledge is to be narrowly construed in the immigration context and requires positive information of a worker's undocumented status. Moreover, we are required to defer to the arbitrator's factual findings even when evaluating an award for violation of public policy. Accordingly, given the extremely short time that Aramark gave its employees to return with further documents and the arbitrator's finding that Aramark had no "convincing information" of immigration

violations, the employees' failure to meet the deadline simply is not probative enough of their immigration status to indicate that public policy would be violated if they were reinstated and given backpay. Therefore, the district court erred and the award must be confirmed.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Letter Sent to Aramark and Aramark's Response

Aramark is a corporation that employs approximately 170,000 people in the United States, and its facilities management division provides labor for the Staples Center, a 19,000-seat sports and entertainment venue in downtown Los Angeles. In early 2003, Aramark received letters from the SSA notifying it that the social security numbers of some 3,300 of its employees nationwide did not match those in the SSA's database. Aramark reacted to these "no-match" letters by asking its regional managers to confirm that the information it provided SSA matched the information provided by employees and, if so, to require corrective steps from the employees they supervised. On April 15 and 16, 2003, instructions were relayed to 48 Aramark employees working at the Staples Center, who were represented by SEIU and employed pursuant to a CBA between SEIU and Aramark. Aramark's instructions to the Staples Center employees read as follows:

1. Please return to the [SSA] office to correct [the] discrepancy

2. Return to Aramark Facility Services at Staples Center with one of two items.

   a) A new social security card, [sic] photo copies will not be accepted

   b) Verification form that shows a new card is being processed.

3.  *You have three working days from the post-marked date of this letter to bring either.*[ ]You have 90 days from the date of re-application on your receipt to bring in your new card.

4.  A new card or verification of renewal must be in the office no later then [sic] close of business 4pm on Wednesday April 23rd, 2003.

.  .  .

If you fail to comply with this letter and you do not bring in the proper documents then unfortunately your employment with Aramark will be terminated.

(emphasis added).

No employee was aware of the policy before receiving the mismatch letter. Believing the three-day turnaround time was too onerous, SEIU requested an extension, but Aramark denied this request.

Fifteen of the Staples Center employees obtained the requested documentation in time and continued to work. However, 33 employees did not timely comply and were fired. The last day of work for virtually all of them was either April 16, 2003, or April 18, 2003. Most were officially fired effective April 23, while a few were fired April 28, 2003. Although the instruction letters from Aramark stated that employees were expected to visit an SSA office and provide the initial documentation within three days, the employees were actually given seven to ten days to provide the required paperwork, though nothing in the record indicates that they knew they had this much time. The fired workers were told that they would be rehired if they supplied the required documentation; nothing indicates *when* they received this information.

Though it suspected immigration violations, Aramark did not know for sure why the terminated employees did not provide additional documents and even argued to the arbitrator that they could have had "valid" work eligibility. Each of the fired employees had, at the time they were hired, properly completed the federal Employee Eligibility Verification Form ("Form I-9") and provided Aramark with facially valid documents establishing their identity and eligibility to work in the United States. Moreover, Aramark was not notified by any federal agency that its workers were suspected of being undocumented.

## B. Arbitration

After the terminations, SEIU filed a grievance on behalf of the Staples Center employees, contending that Aramark had violated the CBA by firing them without just cause. Pursuant to the CBA, the matter was submitted to binding arbitration. Over two days of hearings, the parties presented testimony concerning the no-match letters, Aramark's obligation to comply with applicable tax and immigration laws, and the procedures by which the Staples Center employees were fired.

Ultimately, the arbitrator concluded that there was no "convincing information" that any of the terminated workers were undocumented. He thus found that the firings were without just cause, ruled in favor of SEIU, and awarded the workers back-pay and reinstatement.

## C. District Court Proceedings

After the arbitrator's ruling, Aramark filed a complaint in U.S. District Court to vacate the arbitration award, and SEIU counter-claimed to confirm it. The parties filed cross-motions for summary judgment, and at a hearing held September 29, 2006, the district court ruled in favor of Aramark. The court reasoned that because the fired employees failed to indicate that they were beginning the process of correcting the SSN

mismatch, Aramark had constructive notice that they were ineligible to work in the United States. Therefore, the court held that the arbitrator's award of reinstatement and back-pay violated public policy because it would require Aramark to violate the immigration laws. SEIU timely appealed.

## III.  STANDARD OF REVIEW

We review vacation of arbitration awards like "any other district court decision . . . accepting findings of fact that are not 'clearly erroneous' but deciding questions of law de novo." *Barnes v. Logan*, 122 F.3d 820, 821 (9th Cir. 1997) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947-48 (1995)). Here, the district court resolved the matter on the parties' cross-motions for summary judgment, which necessarily present questions of law. We must therefore decide de novo whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004); *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002) (stating standard for cross-motions).

## IV.  DISCUSSION

### A.  The Legal Standard for Review of the Arbitrator's Award

"The scope of review of an arbitrator's decision in a labor dispute is extremely narrow." *Federated Dep't Stores v. United Food & Commercial Workers Union, Local 1442*, 901 F.2d 1494, 1496 (9th Cir. 1990). Arbitration awards are ordinarily upheld so long as they represent a "plausible interpretation of the contract." *Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752*, 989 F.2d 1077, 1080 (9th Cir. 1993). However, one narrow exception to this generally deferential review is the "now-settled rule that a court need not, in fact cannot, enforce an award which violates public policy."

*Stead Motors v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200, 1209 (9th Cir. 1989) (en banc); *accord SFIC Properties, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 103 F.3d 923, 925 (9th Cir. 2003). "[T]he question of public policy is ultimately one for resolution by the courts." *United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 174 (9th Cir. 1995). The public policy exception is Aramark's sole basis for attacking the arbitration award in this case.

**[1]** "To vacate an arbitration award on public policy grounds, we must (1) find that an explicit, well defined and dominant policy exists here and (2) that the policy is one that specifically militates against the relief ordered by the arbitrator." *Id.* at 174 (citations and quotation marks omitted); *accord W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983). In evaluating a public policy argument, we "must focus on the award itself, not the behavior or conduct of the party in question." *S. Cal. Gas Co. v. Utility Workers Union of Am., Local 132, AFL-CIO*, 265 F.3d 787, 795 (9th Cir. 2001). We have stressed that "courts should be reluctant to vacate arbitral awards on public policy grounds," because "[t]he finality of arbitral awards must be preserved if arbitration is to remain a desirable alternative to courtroom litigation." *Arizona Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 992 (9th Cir. 1995). Moreover, before the award will be vacated as against public policy, the policy violation must be "clearly shown." *Stead Motors*, 886 F.2d at 1225 (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987)).

Importantly, the public policy inquiry proceeds by taking the facts as found by the arbitrator. "The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them . . . [.] Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task." *Id.* at 1211 (quoting *Misco*, 484

U.S. at 45); *accord Prudential-Bache Secs., Inc. v. Tanner*, 72 F.3d 234, 242 (1st Cir. 1995); *Bd. of County Comm'rs of Lawrence County, Ohio v. L. Robert Kimball & Assocs.*, 860 F.2d 683, 686 (6th Cir. 1988); *see also Int'l Bhd. of Elec. Workers, Local 97 v. Niagra Mohawk Power Corp.*, 143 F.3d 704, 716 (2d Cir. 1998) ("[I]n reviewing an arbitral award for possible violations of public policy . . . [a] court is not authorized to revisit or question the fact-finding or the reasoning which produced the award."); *E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Ass'n*, 790 F.2d 611, 617 (7th Cir. 1986) (rejecting a public policy attack because it would "require[ ] this Court to re-find facts found by the arbitrator"), *disapproved on other grounds by Misco*, 484 U.S. at 35 n.7. Accordingly, in evaluating whether the arbitrator's award violated public policy here, we will not revisit the arbitrator's factual findings, in particular the finding that there was no "convincing information" that any of the terminated workers were undocumented.

### B.   Analysis

As we explain below, Aramark has identified a sufficiently explicit, well-defined, and dominant public policy — compliance with immigration law — that, in the proper case, would be the basis for vacating an arbitration award. However, the policy in this case does not specifically militate against the arbitrator's award of reinstatement and back-pay.

### 1.   The Asserted Public Policy

**[2]** The main public policy to which Aramark points is expressed in the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359 (1986). Specifically, Aramark cites the laws that (1) employers are subject to civil and criminal liability if they employ undocumented workers "knowing" of their undocumented status, and (2) the term "knowing" includes constructive knowledge. *See*

8 U.S.C. § 1324a(a)(1), (2);[1] 8 C.F.R. § 274a.1(*l*). We agree that these policies are germane to the arbitrator's reinstatement award because they would necessarily be violated if Aramark knowingly reinstated undocumented workers. They are also germane to the back-pay award because the Supreme Court has held that immigration policy precludes such awards to undocumented workers. *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 148-152 (2002). These policies are "explicit," "well-defined," and "dominant," expressed not by "general considerations" but by the IRCA, its implementing regulations, and Supreme Court case law interpreting it. They are therefore an adequate basis for Aramark's public policy attack. *See S. Cal. Gas Co.*, 265 F.3d at 794-95 (quoting *Misco*, 484 U.S. at 42).[2]

---

[1] 8 U.S.C. § 1324a(a) provides in relevant part:

(1) In general

It is unlawful for a person or other entity—

(A) to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3) of this section) with respect to such employment, or

(B) (i) to hire for employment in the United States an individual without complying with the requirements of subsection (b) of this section or (ii) if the person or entity is an agricultural association, agricultural employer, or farm labor contractor (as defined in section 1802 of Title 29), to hire, or to recruit or refer for a fee, for employment in the United States an individual without complying with the requirements of subsection (b) of this section.

(2) Continuing employment

It is unlawful for a person or other entity, after hiring an alien for employment in accordance with paragraph (1), to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.

[2] Aramark also argues in passing that enforcement of the arbitrator's award would violate tax policy, citing Treasury Department regulations prohibiting employers from reporting incorrect SSN information to the IRS. 26 C.F.R. § 301.6721-1(c)(2)(i). However, this policy would not

## 2.  Whether the Policy Specifically Militates Against the Award

The more difficult question is whether these policies "specifically militate" against the arbitrator's award here — that is, whether the arbitrator's award would have forced Aramark to reinstate and provide back-pay to undocumented workers where Aramark had "constructive knowledge" that they were undocumented. *See* 8 U.S.C. § 1324a(a)(1), (2); 8 C.F.R. § 274a.1(*l*).

**[3]** As defined in the relevant regulation, "[c]onstructive knowledge is knowledge that may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition." 8 C.F.R. § 274a.1(*l*). We have stressed that, for purposes of the IRCA, "constructive knowledge" is to be narrowly construed:

> IRCA . . . is delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens. The doctrine of constructive knowledge has great potential to upset that balance, and it should not be expansively applied. The statute prohibits the hiring of an alien "*knowing* the alien is an unauthorized alien . . . with respect to such employment." 8 U.S.C. § 1324a(a)(1)(A) (emphasis added). Insofar as that prohibition refers to actual knowledge, as it appears to on its face, any employer can

---

"specifically militate" against the arbitrator's award, because the award did not require reporting of incorrect numbers, or prohibit further verification procedures after the employees were reinstated. Aramark also suggests that it might be forced to violate RICO and the Sarbanes-Oxley Act if the arbitrator's award were enforced. But it has waived these arguments by failing adequately to brief them. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003).

> avoid the prohibited conduct with reasonable ease. When the scope of liability is expanded by the doctrine of constructive knowledge, the employer is subject to penalties for a range of undefined acts that may result in knowledge being imputed to him. To guard against unknowing violations, the employer may, again, avoid hiring anyone with an appearance of alienage. To preserve Congress' intent in passing the employer sanctions provisions of IRCA, then, the doctrine of constructive knowledge must be sparingly applied.

*Collins Foods Int'l, Inc. v. INS*, 948 F.2d 549, 554-55 (9th Cir. 1991). In *Collins*, we reversed an ALJ's holding that the employer had constructive knowledge of an immigration violation because it had extended an offer of employment over the telephone and overlooked that the employee's social security card was fraudulent. *See id.* at 551, 555-56. We distinguished other cases finding constructive knowledge on the grounds that the employer there did not have "positive information" that the employee was undocumented. *Id.* at 555. In those distinguishable cases, on which Aramark relies heavily here, the INS specifically visited the employer and notified it that its employers were suspected unlawful aliens and should be terminated if inspection of their documents did not allay the concerns. *See New El Rey Sausage Co. v. INS*, 925 F.2d 1153, 1155 (9th Cir. 1991); *Mester Mfg. Co. v. INS*, 879 F.2d 561, 564 (9th Cir. 1989).[3]

---

[3]Contrary to Aramark's contention, *Collins* is not distinguishable on the ground that in this case, there is no accusation of discriminatory conduct by the employer. *Collins* did not involve discrimination either. Rather, the court stressed that by too expansively viewing constructive knowledge, the doctrine would risk encouraging employers to avoid liability through discriminatory practices. 948 F.2d at 554-55; *see also Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1013 (9th Cir. 2007) (holding that the IRCA did not require an employer to terminate a worker whose visa had expired but could be readily renewed).

Here, Aramark essentially argues that two facts gave it constructive notice of immigration violations: (1) the no-match letters themselves and (2) the employees' responses (or lack thereof). We address each contention in turn.

### a.   The Letters Themselves

[4] Given the narrow scope of the constructive knowledge doctrine, the "no-match" letters themselves could not have put Aramark on constructive notice that any particular employee mentioned was undocumented. To understand why, some background on the purpose of the no-match letters is helpful. The SSA routinely sends the letters when an employer's W-2 records differ from the SSA's database regarding an employee's social security number ("SSN"). When there is a discrepancy, the SSA cannot post an employee's social security earnings to his or her account, and instead must deposit the funds into a national "earnings suspense fund," which is a very large fund containing more than 250 million mismatched records and totaling more than $500 billion. *Social Security Number High-Risk Issues: Hearing Before the Subcomms. on Social Security and Oversight of the H. Comm. on Ways and Means*, 109th Cong. 60 (Feb. 16, 2006) (statement of Patrick P. O'Carroll, SSA Inspector General), *available at* http://waysandmeans.house.gov/hearings.asp?formmode=printfriendly&id=4710 (last visited June 9, 2008).[4] The Inspector General of the SSA believes that "the chief cause of wage items being posted to the [earnings suspense fund] instead of an individual's earnings record is unauthorized work by noncitizens." *Id.* However, the main purpose of the no-match letters is not immigration-related, but rather is simply to indicate to workers that their earnings are not being properly credited. *See id.* (statement of James B. Lockhart, III, Deputy Commissioner of Social Security), *available at* http://

---

[4]Both the parties and amicus cite various agency and legislative materials that are not part of the record. We treat these citations as requests for judicial notice and grant the requests. Fed. R. Evid. 201(b), (d).

waysandmeans.house.gov/hearings.asp?formmode=
printfriendly&id=4708 (last visited June 9, 2008).

In addition to misuse by undocumented workers, SSN mismatches could generate a no-match letter for many reasons, including typographical errors, name changes, compound last names prevalent in immigrant communities, and inaccurate or incomplete employer records. By SSA's own estimates, approximately 17.8 million of the 430 million entries in its database (called "NUMIDENT") contain errors, including about 3.3 million entries that mis-classify foreign-born U.S. citizens as aliens. Congressional Response Report: Accuracy of the Social Security Administration's NUMIDENT File (Dec. 2006), *available at* http://www.socialsecurity.gov/oig/ADOBEPDF/auditt xt/A-08-06-26100.htm (last visited June 9, 2008).

**[5]** As a result, an SSN discrepancy does not *automatically* mean that an employee is undocumented or lacks proper work authorization. In fact, the SSA tells employers that the information it provides them "does not make any statement about . . . immigration status" and "is not a basis, in and of itself, to take any adverse action against the employee." Social Security Number Verification Service Handbook, *available at* http://www.ssa.gov/employer/ssnvs_handbk.htm (last visited June 9, 2008). This information is included in the no-match letters, and was added at the urging of advocacy groups such as amicus National Immigration Law Center to combat abuses by employers who assumed that the workers mentioned in the letters were undocumented.

Moreover, employers do not face any penalty from SSA, which lacks an enforcement arm, for ignoring a no-match letter. The IRS also imposes no sanctions stemming from the no-match letters. It requires no additional solicitations of an employee's SSN unless it sends a "penalty notice" to the employer indicating that the SSN is incorrect — a notice Aramark does not contend it received. Internal Revenue Service

Pub. 1586: Reasonable Cause Regulations and Requirements for Missing and Incorrect Name/TINs at 8-9 (2007 Rev.), *available at* http://www.irs.gov/pub/irs-pdf/p1586.pdf (last visited June 9, 2008). The IRS also does not require any reverification of a worker's documents following receipt of a mismatch notice from the SSA. *See id.* at 9.

To the same effect are statements from the Office of Special Counsel of Immigration-Related Practices, which is an agency of the Department of Justice authorized to investigate unfair immigration-related employment practices. *See* 8 U.S.C. § 1324b(c). The Office of Special Counsel states that "[a] no match does not mean that an individual is undocumented" and that employers "should not use the mismatch letter by itself as the reason for taking any adverse employment action against any employee." Office of Special Counsel, Frequently Asked Questions, *available at* http://www.usdoj.gov/crt/osc/htm/facts.htm#verify (last visited June 9, 2008).

As Aramark notes, the Department of Homeland Security ("DHS") recently has taken steps to use the no-match letters in its enforcement of the immigration laws. In June 2006, DHS proposed to amend 8 C.F.R. § 274a.1, which sets forth DHS interpretations of terms including "knowing," to include receipt of no-match letters in its discussion of "constructive knowledge." Safe-Harbor Procedures for Employers Who Receive a No-Match Letter, 71 Fed. Reg. 34281-01, 34281 (June 14, 2006). After some changes prompted by extensive public comment, *see* 72 Fed. Reg. 45611 (Aug. 15, 2007), the proposed amendment was adopted and the resulting regulation currently provides in relevant part:

> The term *knowing* includes having actual or constructive knowledge. Constructive knowledge is knowledge that may fairly be inferred through notice of certain facts and circumstances that would lead a person, through the exercise of reasonable care, to know about a certain condition. Examples of situa-

tions where the employer may, *depending on the totality of relevant circumstances*, have constructive knowledge that an employee is an unauthorized alien include, but are not limited to, situations where the employer . . . *[f]ails to take reasonable steps* after receiving information indicating that the employee may be an alien who is not employment authorized, such as . . . [w]ritten notice to the employer from the Social Security Administration reporting earnings on a Form W-2 that employees' names and corresponding social security account numbers fail to match Social Security Administration records.

8 C.F.R. § 274a.1(*l*) (emphases added). So, even the DHS regulations, which were adopted after Aramark received the letter at issue here and are currently subject to a preliminary injunction,[5] would not treat the no-match letter by itself as creating constructive knowledge of an immigration violation. Instead, the regulations would look further to "the totality of the circumstances" and whether the employer took reasonable steps after receiving the no-match letter.

[6] In sum, the letters Aramark received are not intended by the SSA to contain "positive information" of immigration status, and could be triggered by numerous reasons other than fraudulent documents, including various errors in the SSA's NUMIDENT database. Indeed, the letters do not indicate that

---

[5]In October 2007, the United States District Court for the Northern District of California preliminarily enjoined the government from enforcing the new regulations, including through sending no-match letters that refer to them. *See AFL v. Chertoff*, No. 07-4472, ___ F. Supp. 2d ___, 2007 WL 2972952, at *15 (N.D. Cal. Oct. 10, 2007). After the district court's ruling, the government then moved to stay proceedings pending new administrative rule-making. The district court granted the motion and stayed proceedings until March 28, 2008. DHS then proposed to repromulgate the regulation without change. *See* Safe-Harbor Procedures for Employers Who Receive a No-Match Letter: Clarification; Initial Regulatory Flexibility Analysis, 73 Fed. Reg. 15944, 15955 (March 26, 2008).

the government suspects the workers of using fraudulent documents. Rather, they merely indicate that the worker's earnings were not being properly credited, *one explanation of which* is fraudulent SSNs. This falls short of the "positive information" from the government that was held to provide constructive notice in *Mester* and *New El Rey* and held lacking in *Collins*. *See Collins*, 948 F.2d at 554-55. Without more, the letters did not provide constructive notice of any immigration violations.

### b.   Employees' Reactions

Aramark also maintains that constructive notice resulted from the fired workers' *reactions* to the no-match letters and Aramark's directive to return quickly with documents from the SSA. It argues that it provided the employees a reasonable time in which to correct their SSN discrepancies, and that their failure to do so is sufficiently probative of their immigration status to rise to the level of "constructive notice" that they were undocumented.

We disagree. Though the question is a close one, two considerations weigh against a finding of constructive notice here: (1) the arbitrator's findings, and (2) the short turnaround time. Moreover, contrary to the district court's conclusion, the analysis is unaffected by Aramark's offer to rehire any terminated employees who later came forward with proper documentation.

### (1)   The Arbitrator's Findings

**[7]** First, as we indicated above, the entire inquiry must proceed in light of the arbitrator's finding that there was no "convincing information" that any of the fired workers were undocumented. The arbitration came down to essentially the same question that the court must answer here: whether it could be said that the fired workers were undocumented. The arbitrator weighed the same evidence that the parties point to,

and concluded that none of it constituted "convincing information" of immigration violations. While it is true that it is ultimately for the court to determine whether the arbitrator's award would violate public policy, *Foster Poultry Farms*, 74 F.3d at 174, his factual findings are not up for discussion, *see, e.g.*, *Misco*, 484 U.S. at 45, and weigh strongly against Aramark's position. Put simply, it is difficult to conclude that Aramark had "constructive notice" — meaning "positive information" — of a fact when there was no "convincing information" of it.[6]

### (2)   The Turnaround Time

**[8]** Second, and related, is the extremely short time period in which the workers were told they should respond before they would be fired. Both parties spin the record to some degree — SEIU says the workers had only three days to respond, while Aramark stretches the period to 90 days. In fact, workers were told they had three days from the postmark of a letter from Aramark to return with further documentation — either a new social security card, or a "verification form" from SSA that a new card was being processed. If the worker returned with the verification form, they would still have to provide a new card within 90 days.

This adds up to an extremely demanding policy. The initial three-day deadline was from the post-mark of the letter from Aramark, so, given at least one day in the mail, it meant

---

[6]Indeed, the arbitrator's findings completely foreclose Aramark's reliance on arbitration testimony that "[s]ome employees came in and said they were not able to provide the proper documentation and asked if they could work anyways." The arbitrator excluded this statement as hearsay. The ruling was erroneous, as a statement from an employee in this context would be a party admission. Fed. R. Evid. 801(d)(2). Nonetheless, we must take the facts as found by the arbitrator, and we cannot revisit his evidentiary rulings. *See Misco*, 484 U.S. at 40 ("[W]hen the subject matter of a dispute is arbitrable, 'procedural' questions which grow out of the dispute and bear on its final disposition are to be left to the arbitrator.").

workers had at most two days to respond. And in these two days, the workers were expected to gather information that would prove to SSA that they were entitled to a social security number, perhaps obtain legal representation, and navigate their way to a SSA office during business hours while still attending to whatever work and family obligations they had. It seems entirely possible — even likely — that many of the Staples Center employees concluded they could not meet the initial deadline, and then simply stopped trying. Nothing in the record indicates otherwise, and indeed nothing indicates that the workers understood beforehand that they would actually have seven to ten days before their terminations became effective.[7]

[9] Notably, and contrary to Aramark's contention, its reverification policy was significantly more accelerated than the one envisioned by the federal safe harbor regulations (which, as we mentioned above, were promulgated after the arbitrator's ruling in this case and are currently subject to a preliminary injunction). As currently written, employers would qualify for the safe-harbor (that is, not be subject to prosecution on a "constructive knowledge" theory) so long as they asked the employees to provide further documentation from the SSA within 90 days of the date the employer received the no-match letter. *See* 8 C.F.R. § 274a.1(*l*)(2)(i)(B).[8]

---

[7]Moreover, Aramark has introduced no evidence to suggest that the "verification form" workers were instructed to obtain was actually available from nearby SSA offices. Testimony at the arbitration hearing indicated that not all SSA offices provide receipts that would evidence an applicant's request for a new card. So, it is entirely possible that workers were asked to return with a document that was, in practice, unavailable.

[8]This 90-day deadline was adopted after staff at the EEOC recommended to DHS that the initial proposal, which would have given only a 60-day deadline, be extended because it did not provided enough time for employees to "collect, organize, deliver documentation, and perhaps meet with the relevant federal agency and/or seek legal advice while maintaining their work hours." Letter from Peggy R. Mastroianni, Associate Legal Council, EEOC (Aug. 14, 2006), *available at* http://www.eeoc.gov/foia/letters/2006/vii_national_immigration.html (last visited June 9, 2008); *see also* 71 Fed. Reg. 34,281, 34,285 (June 14, 2006) (proposing Rule with 60-day deadline).

Nothing requires the employer to demand action of any kind before 90 days, including any "verification form" indicating that the employee has contacted SSA. Moreover, even if the employee cannot resolve the discrepancy within 90 days, the employer can still qualify for the safe-harbor if it completes a new Form I-9 for the employee (using documents that do not depend on the disputed social security number). *See id.* § 274a.1(*l*)(2)(iii). Had the safe-harbor provision been in effect, Aramark could easily still have qualified for it when it fired the Staples Center employees. This weighs strongly against constructive notice here.

### (3)  The Offer to Rehire

Perhaps realizing that it had imposed too short a turn-around time, Aramark told the workers that they would be rehired at any point if they provided the requested documentation. Aramark relies heavily on this fact in its appeal, and the district court found it to weigh heavily in Aramark's favor, stating:

> It kind of startled me a little bit. In terms of the situation now and that is that none of these employees, as I understand it, have provided anything — reconciliation to show that there's valid social security numbers, et cetera. What is Aramark supposed to do? Keep them on until when?

**[10]** With all due respect to the district court, this question misses the mark. It presupposes that the court, in determining whether the arbitrator's award ran specifically counter to public policy, could reweigh the evidence of events after the firings. This was improper: the district court should not have disturbed the arbitrator's implicit conclusion that the post-termination evidence did not constitute "convincing information" of immigration violations. *See, e.g.*, *Stead Motors*, 886 F.2d at 1211.

The Supreme Court addressed a similar situation in *Misco*. In that case, a manufacturing employee was fired under a policy prohibiting possession and consumption of marijuana on company property. 484 U.S. at 32 & n.2. The employer knew at the time of firing that the employee (1) had been arrested for possession of marijuana at his home; and (2) had been present in someone else's car in a company lot where marijuana was found. *See id.* at 33. At an arbitration hearing, the company learned for the first time that police had searched the fired employee's own car while it was parked on company property, and had found marijuana inside. *See id.* The arbitrator declined to consider this evidence, however, because the employer did not rely on it as a basis for the discharge. *Id.* at 34. The arbitrator found insufficient evidence that the employee had violated company policy, and therefore ordered reinstatement. The employer then sued in district court, which held that the award of reinstatement violated public policy concerning intoxicated individuals operating dangerous machinery. *Id.* at 34-35. The court of appeals agreed, reasoning that the arbitrator should have considered the evidence that marijuana was found in the employee's own car on the company lot. *See id.*

The Supreme Court reversed and specifically disavowed the court of appeals' reweighing of the facts based on the post-termination evidence. It held that the arbitrator's decision to disregard the evidence was part of his authority to decide procedural questions arising in the arbitration, which were not subject to review absent evidence of dishonesty or bad faith. *Id.* at 39-40. It also criticized the appellate court for making a factual inference based on this evidence (that is, that an employee who had marijuana in his car would, if reinstated, likely operate dangerous machinery while under the influence). The court stated:

> [I]t was inappropriate for the Court of Appeals itself to draw the necessary inference . . . . The parties did not bargain for the facts to be found by a court, but

by an arbitrator chosen by them . . . . Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. If additional facts were to be found, the arbitrator should find them in the course of any further effort the Company might have made to discharge [the employee] for having had marijuana in his car on company premises.

*Id.* at 44-45.

**[11]** Here, similarly, the arbitrator declined to credit the post-termination evidence — i.e., that the fired employees had not returned with new social security documents to accept Aramark's offer of a rehire. True, the arbitrator did not explicitly state whether he viewed the evidence as irrelevant because Aramark could not have considered it as a basis for the terminations,[9] or whether it was simply unpersuasive given the variety of potential explanations why the employees had not returned (for example, advice from the union, the availability of other jobs, or Aramark's failure to include an offer of back-pay). But regardless of whether he deemed the evidence irrelevant or unpersuasive, under *Misco*, the courts cannot second-guess the arbitrator's findings, even while conducting a public policy inquiry. The arbitrator found no "convincing information" of immigration violations, which necessarily included any inferences that could have been drawn from the employees' failure to later return with docu-

---

[9]As SEIU notes, "arbitrators generally hold that a discharge must stand or fall upon the reason given at the time of discharge; the employer cannot add other reasons when the case reaches arbitration." Elkouri & Elkouri, How Arbitration Works 406 (6th ed. 2003) (citations and quotations omitted); *see also Misco*, 484 U.S. at 40 n.8 ("Labor arbitrators have stated that the correctness of a discharge must stand or fall upon the reason given at the time of discharge, . . . and arbitrators often, but not always, confine their considerations to the facts known to the employer at the time of the discharge." (citations and internal quotation marks omitted)).

ments. The district court erred by reweighing this evidence and substituting its own judgment for that of the arbitrator.

Moreover, the district court's approach is problematic because it suggests that employers could fire employees mentioned in no-match letters without providing any time at all for a correction, since they could always defend themselves in later proceedings on the ground that employees had still not come forward with appropriate documentation. This risks encouraging discriminatory practices in the name of compliance with the IRCA, in direct contravention of this court's teachings in *Collins*.

One final point. Aramark has introduced no evidence concerning the fired employees' actual employment status other than that they were named in the no-match letters and did not quickly respond to the request for further verification of their social security status. In addition to creating no "constructive notice," this evidence simply does not demonstrate that any of the workers actually were unauthorized to work, particularly because a social security card is only one way to prove work authorization. *See* Office of Special Counsel, Frequently Asked Questions, *available at* http://www.usdoj.gov/crt/osc/htm/facts.htm#verify (last visited June 9, 2008). Absent evidence that the workers were actually unauthorized, Aramark would not violate the statute if it reinstated them. 8 U.S.C. § 1324a(a)(1) (providing it is unlawful to hire an alien "knowing the alien *is an unauthorized alien*" (emphasis added)); *id.* § 1324a(a)(2) (prohibiting knowing continued employment of "an unauthorized alien").

**[12]** Accordingly, the public policy against knowing employment of undocumented workers does not specifically militate against the arbitrator's award.[10]

---

[10]SEUI contends that Aramark's reverification procedures themselves violated public policy. We need not address this argument. True, an arbitration award that violates some public policies may at times be confirmed

## V.  CONCLUSION

This case turns on the deference owed to the arbitrator's factual findings, as well as the narrowness of both the public policy exception and the doctrine of constructive knowledge in the immigration context. Though it seems reasonable to suspect that some of the fired workers were undocumented, the law did not permit the district court to rely on this suspicion in vacating the arbitration award.

We find no issues of material fact and, even viewing the record in the light most favorable to Aramark, conclude that SEIU is entitled to judgment as a matter of law. The decision of the district court is REVERSED and the matter REMANDED with instructions to confirm the arbitration award. *See Foster Poultry Farms*, 74 F.3d at 173 ("An arbitration award must be confirmed as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." (citations, quotation marks, and alterations omitted)).

---

because of countervailing considerations. *See Virginia Mason Hosp. v. Wash. State Nurses Ass'n*, 511 F.3d 908, 917 (9th Cir. 2007) (citing *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57 (2000)). But here, we conclude that public policy does not militate against the arbitrator's award here, so there is no need to balance competing interests.